# Miscellaneous Receipts Act Exception for Veterans' Health Care Recoveries

The Veterans Reconciliation Act of 1997 creates an exception to the Miscellaneous Receipts Act to the extent that a recovery or collection under the Federal Medical Care Recovery Act is based on medical care or services furnished under chapter 17 of title 38, United States Code, and thus allows the deposit of such a recovery or collection in the Department of Veterans Affairs Medical Care Collections Fund.

December 3, 1998

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

This responds to your request of May 28, 1998, that we examine whether certain funds received as part of a settlement under the Federal Medical Care Recovery Act, Pub. L. No. 87–693, 76 Stat. 593 (1962) ("MCRA"), codified as amended at 42 U.S.C. §§ 2651–2653 (1994 & Supp. II 1996), may be transferred to the Department of Veterans Affairs Medical Care Collections Fund ("VA Fund") notwithstanding the general requirement contained in the Miscellaneous Receipts Act ("MRA") that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim," 31 U.S.C. § 3302(b) (1994). For the reasons outlined below, it is our view that the portion of the settlement amount that was calculated to compensate the Government for its claims under MCRA for medical care or services furnished under chapter 17 of Title 38, which governs certain veterans' health benefits, may be transferred to the VA Fund by virtue of the Veterans Reconciliation Act of 1997, Pub. L. No. 105–33, § 8023(a)(1), 111 Stat. 251, 665, codified as amended at 38 U.S.C. § 1729A (Supp. IV 1998), which creates an exception to the MRA "to the extent that a recovery or collection under . . . [MCRA] is based on medical care or services furnished under this chapter [i.e. Chapter 17 of Title 38]." 38 U.S.C. § 1729A(b)(6). Because the information that you have provided does not allow us to determine the amount of the settlement that was intended to compensate the federal government for its claims under MCRA, however, we are unable to give any more specific guidance on this issue.[1]

## I. Settlement Background

In 1993, numerous tort actions brought in federal district courts throughout the country by persons with hemophilia against manufacturers of blood products were centralized as Multidistrict Litigation No. 986 before Judge Grady in the Northern

---

[1] We have not been asked to address any other questions regarding this settlement

District of Illinois. In these cases, individuals with hemophilia who contracted the HIV virus, and representatives of the estates of such individuals who have died, sued several companies who extracted the blood proteins that hemophiliacs lack (known as Factors VIII and IX) from donated blood and provided these proteins in the form of "factor concentrates" to hemophiliacs for injection. In addition to suing these "Fractionaters," as the companies are known based on the manufacturing process involved, plaintiffs also sued the National Hemophilia Foundation and individual health care providers.[2]

Although the United States chose not to intervene in the suits, it also had potential claims against the Fractionaters, including those under MCRA based on the provision of certain health care to veterans.[3] MCRA provides a mechanism for the recoupment of certain medical costs and provides in relevant part:

> In any case in which the United States is authorized or required by law to furnish or pay for hospital, medical, surgical, or dental care and treatment . . . to a person who is injured or suffers a disease . . . under circumstances creating a tort liability upon some third person . . . to pay damages therefor, the United States shall have a right to recover (independent of the rights of the injured or diseased person) from said third person, or that person's insurer, the reasonable value of the care and treatment so furnished, to be furnished, paid for, or to be paid for and shall, as to this right be subrogated to any right or claim that the injured or diseased person . . . [or] . . . estate . . . has against such third person to the extent of the reasonable value of the care and treatment so furnished, to be furnished, paid for, or to be paid for.

42 U.S.C. § 2651(a).

The Fractionaters commenced negotiations of a global settlement of the claims of the class members[4] and agreed to pay $100,000 for each approved claim, as well as a settlement with major private health care insurers, whom they agreed

---

[2] *See In re "Factor VIII or IX Concentrate Blood Products," Product Liab. Litig.*, 853 F. Supp 454 (Judicial Panel on Multidistrict Litigation 1993), *Wadleigh v. Rhone-Poulenc Rorer, Inc.*, 157 F R.D 410 (N.D Ill 1994), *rev'd by order of mandamus, In the Matter of Rhone-Poulenc Rorer Inc*, 51 F 3d 1293 (7th Cir 1995), and *cert. denied*, 516 U.S. 867 (1995); *In re Factor VIII or IX Concentrate Blood Products Litig.*, 169 F.R.D 632 (N D Ill 1996)

[3] The draft memorandum from the Torts Branch to then-Acting Associate Attorney General John C Dwyer also discusses claims (and potentially applicable recoupment provisions regarding claims) based on the provision of health care services to government employees and their dependents under the Federal Employees Health Benefits Program as well as to individuals generally through the Medicare, Medicaid, and Indian Health Service programs. *See* Memorandum for John C. Dwyer, Acting Associate Attorney General, from Frank W Hunger, Assistant Attorney General, Civil Division, *Re. Affirmative Claims for Reimbursement of Federally-Funded Health Care Provided to Persons with Hemophilia Infected with HIV* (undated draft memorandum)

[4] At the request of the parties, Judge Grady approved a class specifically for settlement purposes after the Seventh Circuit had reversed Judge Grady's prior certification of a class for purposes of a trial. *See In the Matter of Rhone-Poulenc Rorer Inc.*, 51 F 3d at 1294–1304

to pay ten cents per insured life in exchange for full release of all reimbursement and subrogation claims for recovery of costs of care or treatment of class members arising from use of factor concentrates.

The Fractionaters also approached the federal government with an offer to settle any claims of the United States based on the provision of health care to hemophiliacs, including veterans, who contracted the HIV virus. The Torts Branch, in cooperation with the respective agencies responsible for the health care services involved, entered into an out-of-court settlement with the Fractionaters, under which the latter paid the United States ten cents per federal health care system beneficiary and released the United States from all claims and actions arising out of, or related to, the use of factor concentrates by claimants. In exchange, the United States released the Fractionaters from all claims for reimbursement of medical expenses, all claims and causes of action under certain civil fraud statutes, and common law contribution and indemnity rights related to Federal Tort Claims Act cases brought against the United States. *See* Settlement Agreement ¶¶ A & B.1–2.

The settlement figure was calculated based on agency estimates of the numbers of persons entitled to federally subsidized health care in each of the federal programs that the Torts Branch believed had potential claims of reimbursement against the Fractionaters. The total number of covered persons was estimated at 121,881,000, which included 25,881,000 veterans, yielding a final settlement amount of $12,188,100.[5] The Torts Branch entered into an out-of-court settlement that was conditioned on Judge Grady's entering a global settlement in the private litigation.

On May 8, 1997, Judge Grady entered a Final Order and Judgment approving a global settlement of the multidistrict litigation, and on August 15, 1997, the Torts Branch received four checks for a total of $12,188,100, which were deposited in the Treasury on August 19, 1997.

On March 25, 1998, the Department of Veterans Affairs requested that the amount of $2,510,457 (which represents the settlement that was calculated based on the veteran population of 25,881,000, i.e. $2,558,100, less the Department of Justice's 3% collection fee)[6] be deposited in the VA Fund pursuant to the Veterans Reconciliation Act, 38 U.S.C. § 1729A.

---

[5] Agency estimates of covered individuals in the other programs that the Torts Branch identified as having potential claims against the Fractionaters were as follows: Medicare (38,600,000), Medicaid (38,700,000), Indian Health Services (1,500,000), Federal Employees Health Benefits Program (9,000,000), Civilian Health and Medical Program of the Uniformed Services (5,300,000), and Department of Defense (2,900,000).

[6] Pub L No. 103–121, § 108, 107 Stat 1153, 1164 (1993) provides: "Notwithstanding 31 U.S.C 3302 or any other statute affecting the crediting of collections, the Attorney General may credit, as an offsetting collection, to the Department of Justice Working Capital Fund, for fiscal year 1994 and thereafter, up to three percent of all amounts collected pursuant to civil debt collection litigation activities of the Department of Justice."

## II. *Receipt of Payments*

As a general matter, the Miscellaneous Receipts Act requires that "[e]xcept as provided in § 3718(b) of this title, an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). In addition to cases covered by the express exception in § 3718(b), which relates to payments to private counsel retained to assist in the pursuit of claims, the MRA generally does not govern in two situations: first, where an agency has statutory authority to direct funds elsewhere, and second, when receipts qualify as "repayments" to an appropriation. *See generally* 2 Office of the General Counsel, United States General Accounting Office, Principles of Federal Appropriations Law 6–108 (2d ed. 1992).[7]

In 1972 the Comptroller General opined with regard to MCRA (as it existed then), that "[t]his Act does not specify the disposition to be made of monies collected from third party tortfeasors and, consequently, unless a different disposition is otherwise provided, such collections are for deposit in the treasury as miscellaneous receipts as provided by § 3617, revised statutes 31 U.S.C. 484 [the predecessor to 31 U.S.C. § 3302(b)]." 52 Comp. Gen. 125, 126 (1972); *see also* 61 Comp. Gen. 537, 539 (1982) (summarizing holding of 1972 opinion). In 1997, however, Congress passed the Veterans Reconciliation Act of 1997, which established a Department of Veterans Affairs Medical Care Collections Fund, and expressly provided:

> Amounts recovered or collected after June 30, 1997, under any of the following provisions of law shall be deposited in the fund:
>
> . . . .
>
> (6) Public Law 87–693, popularly known as the "Federal Medical Care Recovery Act" (42 U.S.C. 2651 et seq.), to the extent that a recovery or collection under that law is based on medical care or services furnished under this chapter [i.e. Chapter 17 of Title 38, which governs hospital, nursing home, domiciliary, and medical care for veterans].

38 U.S.C. § 1729A(b).[8]

---

[7] The opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues, but they are not binding on departments, agencies, or officers of the executive branch. *See Bowsher v. Synar*, 478 U S. 714, 727–32 (1986).

[8] In 1996 Congress had amended MCRA to allow amounts recovered for medical care furnished by military facilities to be credited to the appropriations supporting the facilities as prescribed by the Secretary of Defense. Pub L No. 104–201, § 1075(a)(5), 110 Stat 2422, 2661 (1996) (codified as amended at 42 U S C § 2651(f) (1994 & Supp II 1996).

In our view, the Veterans Reconciliation Act allows the portion of the settlement amount that was based on claims under MCRA for medical care furnished or to be furnished by the Department of Veterans Affairs under Chapter 17 of Title 38 to be deposited in the VA Fund.[9] Even payment based on an abstract formula, such as ten cents per covered person, as opposed to a calculation of actual expenses for such claims, would qualify as long as the calculation was aimed solely at settling the MCRA claim.

MCRA specifically allows for the United States to recover for "the reasonable value of the care . . . furnished, to be furnished, paid for, or to be paid for." 42 U.S.C. § 2651(a). Thus, some estimate of the value of future costs would be inevitable in determining damages even in a direct court action against the tortfeasor. Moreover, in the context of a settlement, as long as the federal government had claims that it could assert in good faith under MCRA for such services, such claims could be relinquished in return for payment of a reasonable amount reflecting the value of the claims. The Attorney General has the authority to settle a claim consistent with the requirements of the specific scheme under which the claim arises. *See* 28 U.S.C. §§ 516, 519 (1994); *see generally Settlement Authority of the United States in Oil Shale Cases*, 4B Op. O.L.C. 756 (1980). Nothing in MCRA would appear to indicate that Congress intended to limit the Attorney General's discretion to determine a reasonable settlement amount. Even when that amount is determined based on an abstract formula, the government may still be recovering the money for purposes of satisfying the MCRA claim. For example, the government may have determined that the ten-cents-per-veteran formula is an appropriate approximation of the actual expenses incurred in providing MCRA recoverable Chapter 17 services to affected veterans. Thus, to the extent the ten-cents-per-veteran formula was aimed at determining a reasonable figure to compensate the United States for the relinquishment of its MCRA claims against the Fractionaters for Chapter 17 services, the resulting recovery would be "a recovery or collection under [MCRA] . . . based on medical care or services furnished" to veterans under Chapter 17. 38 U.S.C. § 1729A(b). Furthermore, because the payment of the settlement was apparently received on August 15, 1997, the recovery would appear to fall within the time limits of the Veterans Reconciliation Act.

We caution, however, that to the extent the settlement amount was calculated to include compensation to the United States for relinquishment of claims other than the MCRA claims that are outlined above (i.e. to the extent the settlement amount included compensation for claims that might have been made under, for

---

[9] In light of the formulation in MCRA providing for the recoupment of costs for care and treatment "furnished, to be furnished, paid for, or to be paid for," 42 U S C § 2651(a), we believe that the Veterans Reconciliation Act formulation concerning the transfer of funds recovered under MCRA for medical care or services "furnished under this Chapter," 38 U S C § 1729A(b), should be read as authorizing the transfer of funds recovered under MCRA for medical care or services that were furnished in the past or will be furnished in the future under Chapter 17.

example, the False Claims Act or civil monetary penalty laws, or for claims of common law contribution or indemnity rights relating to Federal Tort Claims Act cases), the amount of the settlement that was considered to compensate the United States for these other claims could not be deposited in the VA Fund. Similarly, we note that any MCRA claim recovery formula based on the entire veteran population must reflect only the government's claims regarding Chapter 17 services and must not include claims relating to services furnished or paid for under other health benefit programs, if the formula is intended to yield an amount that may be deposited in the VA fund.

Accordingly, we conclude that the share of the settlement amount attributable to MCRA recoverable Chapter 17 services rendered by the Department of Veterans Affairs (less the 3% Department of Justice collection fee) may be deposited in the Department of Veterans Affairs Medical Care Collections Fund. Thus, to the extent the ten-cents-per-veteran figure was intended to compensate the United States solely for its claims under MCRA for services furnished under Chapter 17 of Title 38, the portion of the settlement amount that was based on the size of the veteran population, less the 3% collection fee, may be deposited in the VA Fund. In light of the information that you have provided us, however, we are unable to determine the extent to which the settlement figure was aimed at compensating the government for its claims under MCRA, and we cannot reach a definitive conclusion on the actual amount that ultimately should be transferred to the VA Fund.

TODD DAVID PETERSON
*Deputy Assistant Attorney General*
*Office of Legal Counsel*